Our last case this morning is 419-0371, Titus v. Cornwell. For the appellant is Heath Uppenkamp. You are Heath, sir? Yes. Did I pronounce that correctly? You did, thank you. Thank you. And for the appellee is Christopher Wetzel. Is that pronounced correctly? That's correct. Thank you. Mr. Uppenkamp, you may proceed, sir. Police court. Counsel. Your honors, I represent Bill Cornwell, the appellant in this matter. I'd like to exert five minutes for rebuttal. It's kind of a unique case. I've never tried to do this before. It's a case that relates to adverse possession. Mr. Cornwell's claim of adverse possession as to certain portions of property on the south and west side of his ground. And I have brought some blowups of the exact exhibits that were used at the trial. And the only way I can think to kind of present the testimony and explain to the court where we think the trial court was in error was to show, your honors, those exhibits and kind of make notes with my marker here. So I would like to proceed in that fashion. Okay, go ahead. All right. The first blowup we have here would have been, you can see, it'll say E15. So if the court wanted to refer to the record, the court could. This is a picture that was taken of the ground shortly before trial. And there is an area back here that's been circled by a witness, Terry Titus. And throughout the record, all the parties referred to something called the wash. It's a kind of drainage, a triangular drainage swampy area. And Mr. Titus has circled the wash in this picture. You'll see that there's obviously a vehicle stacked back in the area of the wash. Now, right here is a marker showing the true property line. All parties agreed and stipulated before trial that that marker, and there's one on the other side, of course, is 55 feet north of the area of the wash. So it's kind of an awkward angle where this picture was taken. But wash there, 55 feet of even width on that side is kind of what we would call the disputed area. I'm going to go a bit in reverse here. So the court can get a great kind of view of this. We would ask the court to ignore the yellow. This is a GIS aerial photograph. The GIS system tried to approximate the property line. That yellow line is not the actual property line. The actual property line, again, is 55 feet north of the wash. And then there is a disputed area also on this side. There's a telephone pole. Mr. Titus, again, circled the telephone pole. That telephone pole is 48 feet west of the edge of Mr. Cornwell's driveway. The actual property line is only 12 feet west of Mr. Cornwell's driveway going that way, of course. And the argument during trial was by Mr. Cornwell, I have possessed and my predecessor has possessed the property at least to a point halfway between the telephone pole and the property line, which would be 24 feet west of the driveway. Now, initially, as I go through these photographs, I would like to point out the wash in all of them because the court can review the testimony. But the wash on these photographs is very evident. In this case, you have, and again, it's a triangular area. This would be the wash. I kind of draw it. That's not going to work. I'll point it out. The wash is right there, as you can see. And this is 2014. Again, the junk has been stacked back to the area of the wash. Now, there is no marking on this area. But the actual property line of 55 feet would be somewhere in this area here. So significantly further south in 2014 is where the property had been stacked. I know it may be tedious, but I think it's important to go through this year after year because these photographs are cooperative of all of the testimony that was presented in the case. This is 2013. Previous one, 2014. Wash right there. Property line and junk stacked back to that area of the wash. As we go through the years, the photography skills or the technology available wasn't as strong. But area of the wash, dark discolored area right there. Property line stacked all the way back to the wash. Again, if you were to say, what's 55 feet? It's not marked on here, but it's going to be somewhere in that area. 2010. Wash right there. Property line, junk stacked all the way back to the edge. True property line. We have a photograph here on that across. It would be right in there. 2009. You can see the dark discolored area of the wash right there. True property line right in there. The junk, I know it's blurry, but junk stacked all the way back to the area of that wash right there. 2007. It's difficult to see. This is probably the most difficult to see. The wash right there. Actual property line somewhere in that area. This is a great one. This is from 2005. This is an exhibit where Mr. Titus had circled the wash. As you can see, circled right there. Dark discolored area. It should be noted that the Tituses owned all of the farmland, the different colored area. But the line distinguishing the two properties is very clear here. This is 2005. Wash circled, property stacked all the way back to the wash. Could you bring that a little closer? Show me where the junk is because I can't see it from where I am. I think there's a tiny strip right there, of course. But this is junk right here. Junk there and there. Again, if that's the wash. Those dark spots are all junk? Correct. Those are vehicles, different types of things. Thank you. 2004. Again, pretty easy to see the wash right here as the dark discolored area. Again, the actual property line is more along that line right there. This is only one year before that last one. You can see the dark areas again. Vehicles, junk stacked all the way up to that darkest colored area of the wash right there. Now we're getting much further back. This is 1999. I know it's difficult to see. That's the area of the wash. That's still junk stacked all the way back to the wash. Again, the distinguishing discoloration of the property lines is pretty easy to see all the way back to the wash, which is that discolored area right there. And finally, 1998. Again, this is Mr. Titus. He circled the telephone pole here. This is pretty easy to see. This junk, you can see the discoloration all the way back to the property line. But that's the wash right there, the dark area, and the property line going all the way back to the wash. All right. That took us all the way back to 1998. The reason I felt it was so important to go through those is because, of course, there is testimony in this case from, as to the wash, four individuals. Were they all presented to the trial court? Were all the witnesses? Yes, they were. All of those are part of the record. And the testimony pertaining to them as well? That's correct. And Judge Lewis found it unpersuasive? It appears he did. What's our standard of review? It would be manifest weight, Your Honor. That essentially means that we have to conclude that his decision was unreasonable? It would be, and again, I'd have to look at the exact language, but it would be obviously wrong, I believe is the language I cited in my brief. Well, given his careful explanation of what he found and why he found it, how are we supposed to reach that conclusion in this case? I'm not sure it was a careful explanation. He referenced the testimony of one particular witness, and I understand manifest weight, and even if there's more than one witness on one side and only one on the other side that says what he says, I understand how that works. But even under a manifest weight standard, sometimes a judge can get it wrong, and I think in this case he did get it wrong. And as to the wash, there were four witnesses who testified. Mr. Cornwell, an individual named Brett Patrick, both testified on Mr. Cornwell's behalf. I won't detail their testimony, but both said unequivocally, junk was stacked from the time Mr. St. John, Mr. St. John is Mr. Cornwell's predecessor in interest. He bought the property in 1993 and almost immediately started moving his junk onto the property. That's all the testimony from both sides. I don't think that's contested, junk moving onto the property quickly after he purchased it in 1993. Both Mr. Patrick and Mr. Cornwell said, yes, junk stacked all the way back to the wash, never moved. Now, never moved further north. Now, Judge Lewis did point to one witness, Justin Titus, who says, yes, the property moved back and forth. This is where the manifest weight standard comes in and why, Your Honors, we believe that Judge Lewis was simply wrong and the opposite conclusion is clear here, which is we just showed ten photographs of the junk stacked all the way back to the wash, not sometimes 55 feet north of the wash and then sometimes all the way back to the wash. The photographs confirm the testimony of Mr. Cornwell and Mr. Patrick. Taken together, that would meet the manifest weight standard. Now, there was, though, Judge Lewis found all kinds of problems with your claim. He found that the use was permissive and insufficient to support an adverse possession. He found continuous possession of the property to be through a visible and ascertainable boundary line. Possession was not hostile or adverse, exclusive or otherwise under a claim of title inconsistent with that of the true owner. All of these are just wrong. Well, Your Honor, I don't even think, and this is a great point, with regard to permissive, it's not even clear where Judge Lewis would have come up with that. Nobody argued at trial that the use was permissive. Nobody said that the Titus's, nobody said, yeah, we said he could use the property. Well, that could be his influence based on what he heard. What would be the opposite of that? They all said, no, we kept telling him to push it back. He was coming onto our property. Now, the testimony is they didn't, well, at least for Mr. Cornwell and Mr. Patrick and other witnesses as we'll get to, they didn't push it back. And, in fact, Terry Titus, when shown that 1999 aerial photograph, he identified the wash, which he circled, and he said, yes, Mr. St. John had stacked the junk all the way back to the wash by 1999, and he agreed that the Titus family never again farmed the disputed area north of the wash after 1999 because Mr. St. John had pushed his stuff to the wash by that time. What about the specific finding he made that when approached by members of the Titus family requesting to move the encroaching property, Mr. St. John would comply. This was a clear acknowledgment. He recognized that he possessed no right to claim to use the property. Is that wrong? Yes, Your Honor, it is wrong. It's one witness, Mr. Justin Titus, said that, but all of the aerial photographs, two other witnesses, and then Mr. Terry Titus at times, all said all the way back to the wash, all the time, consistently. Never moved north of that. Now, again, Judge Lewis took language from one of four witnesses as to the wash. As to the telephone pole, which I'll separate. Isn't he entitled as the trier of fact to believe that one witness is opposed to others who might have disagreed? He is, Your Honor, and that's what makes manifest weight very difficult for me. And we're supposed to disagree with his assessment? You are, Your Honor, supposed to disagree with the assessment when it's, if it's just no matter what he says, we have to agree with it, then we wouldn't be here. There is still a manifest weight standard. I know that standard is difficult, but in this case, it's three witnesses all corroborated by aerial photographs. So, judging it as a whole, it is clear that Judge Lewis simply got this one wrong. Sometimes good judges can get something wrong. I believe he got it wrong in this case. And I think when taken together, all of those witnesses and all of the aerial photographs just paint a picture that cannot be overcome by one witness. I know that Judge Lewis used that one witness's language in his order. That just doesn't make it rock solid, can't be reversed. I do want to cover the telephone pole side of things, and I won't go through each particular photograph, but I do want to point it out to the court. Now, that would be a good use. The most clear one. On this side, where the telephone pole is, the junk did get stacked at times all the way out to the telephone pole, which all the witnesses agreed with. And the parties did agree. This may go to what Judge Lewis was referring to in saying that the junk shifted. My clients do not deny that it shifted at times. It did shift, especially on this side, sometimes all the way out to the telephone pole, sometimes a little bit further back, but always at least to a point halfway between the telephone pole and the driveway. And again, I could show all the maps and the line showing about halfway or further, of course, and many of them to the telephone pole. But the testimony of Terry Titus I want to highlight as to the telephone pole. And again, Terry Titus is a witness for, obviously, the appellee here. He was asked, would you agree with me from the time he, Jerry, started moving stuff onto the property, he was stacking stuff further west than that stake right there, the stake being the 12-feet actual property line? Answer, that is correct. But maybe not all the way out to the telephone pole, correct? There is pictures that show it wasn't out to the telephone pole. I will agree with that, says Mr. Titus. But from the time Jerry moved out there, would you agree maybe at least halfway to the telephone pole he had things stacked up? Yes. So now that's a witness for Ms. Titus, the appellee here, saying yes to the question, was it stacked at least halfway to the telephone pole since the time he moved out there in 1993? That's 20 years right there. Not to mention there was Mr. Cornwell, Mr. Patrick, and Denny Thornton, the highway road commissioner who would have no dog in his fight, who drove by the property every single day as part of his job, and says, yep, I'll testify that it was at least halfway to the telephone pole from the time he moved out there. So one, two, three witnesses, an adverse witness saying yes to that question, and all the aerial photographs against one witness that says, nope, sometimes it was all the way back to the 12 feet next to the driveway, which is an extremely short distance, which would not be supported by any of the aerial photographs. That is manifest weight, Your Honors. That is manifest weight. And I know that's a difficult standard. I believe it's, in this case, it's appropriate to look at all of the evidence, all of the witnesses, and say, yes, those photographs corroborate the testimony of the witnesses, both as to the wash, the photographs especially as to the wash, and four out of five witnesses and the photographs as to the telephone pole. Did the trial court find that the junk line would occasionally creep back to the actual property line, by the legal description, I guess? Did the trial court find that? Right, that is. And did the trial court make that finding with regard to the west boundary dispute and the south boundary dispute, or just the one of those? Well, the court didn't make it clear in its order. It's a singular sentence that says, I find that the junk moved. And you say that that was an incorrect finding. That is an incorrect finding. It was never all the way back to the boundary line on either side. And if the court is referring to the movement, it would be referring to the movement on the west side as the property line by the wash. All those photographs are so clear. And they go back over the years. Don't you have a problem, though, if the junk's moving all over, you kind of have a jagged line instead of a straight line? And doesn't the law regarding adverse possession require that it has to be a specified ascertainable line? It does require a specified ascertainable line. However, on those photographs, and again, Mr. Cornwell is correct. It doesn't have to be, I guess, bumper-to-bumper cars literally in a straight line. There is a very easily identified line on the south side running east and west. And those pictures show it, right? And I understand he's maintaining that property and there's not junk literally on every inch of it so that the property – I think you can easily identify the line at the wash that's 55 feet south of the actual property line. And again, there is a surveyor who came out and said, okay, the real property line, 55 feet to the wash going east-west. So that – I suppose there was a surveyor, a plat map showing exactly what the boundary line would be if the court were to find adverse possession. Thank you, Your Honors. Thank you, counsel. I have an opportunity to address this again in rebuttal. Mr. Wetzel? Thank you, counsel. May it please the Court? Your Honor. Counsel. Good morning. My name is Chris Wetzel. I represent the appellee in plaintiff in this cause, Barbara Titus. To start with, I don't believe there's any disagreement as to the standard review in this case. It's against the manner of the evidence. We agree with that. We also agree, and there's no dispute, as to the legal descriptions set forth and placed on file with both pieces of property at the Cumberland County Clerk of the Court's office. There's no question there. There's no question with regards to the survey that was put into evidence that depicts the boundary line between these two legally described properties. And we don't dispute the law as it surrounds the adverse possession of this case. It's clear that the defendant had the burden of proving by clear and unquivocal evidence in front of Judge Lewis the existence of five elements, the coexistence of five elements for a continuous period of 20 years. So its coexistence of elements would be continuous, hostile, and adverse. I'm sorry, I'm getting old. I have to put my glasses on. Actual, open, notorious, exclusive possession under a claim of title inconsistent with that of the true owner. Those are the five elements that he had to show. Judge Lewis found he showed none of them. What's in dispute, obviously, is the factual findings made by Judge Lewis. And two of those factual findings, I think, are most relevant. He said, on several occasions, members, and I would quote that members is plural of the Titus family, talked to Mr. St. John's about the encroaching personal property. Mr. St. John would then remove the personal property, but as time passed, location of the stored items would creep back. Creep back is the language that Terry Titus used in describing the relation to that junk pile. He also noted that the location of Jerry St. John's personal property was continuously changing. And when approached by the members of the Titus family requesting he move the encroaching property, Mr. St. John would comply. This is a clear acknowledgement that Mr. St. John possessed no right to claim to use the property. There's a lot of description, obviously, about the wash on these photos. Justice Turner, you asked to see 2005 picture and describe what is that. Is that junk? Is that dark spot junk? I asked that same similar question to Mr. Cornwell. Well, do you see any junk on this particular property piece of picture? And that was a 98 diagram. And he pointed to a dark spot in the ground saying, well, that's junk. Well, I could be junk. I don't know. And I don't want to quote him exactly because I'm just, I don't have that quote from the transcript. But he testified to that because I was under the same, where is the junk in this property? Because in my view, 98, I don't see any junk back to the wash. And remember, we filed our complaint in 2016. The 20-year period back from that is 1996. So the 98, I don't see the junk. And again, these pictures are snippets in time. They're not, I mean, it could very well be that that junk was back there at that point in time. And when my clients asked to move it back, he moved it back. And they didn't take a picture of that. They took a picture one time per year. All right. Well, who took the pictures? I think they came from Google. And actually, we provided them. I'm sorry, I didn't understand. You think it was what? It was from Google over Google Earth. And I think my client went back and gathered some of that information. And also with some GSI overhead survey, he provided those documents to me. And I provided them to the council. We both stipulated that's what those photographs showed. And we didn't require either one of us to provide proof of the authenticity. We stipulated to that. I should probably know this, but I don't. Do counties take annual aerials? That's a good question. I don't know. I just got tagged with somebody. Somebody tagged my property as being over the – I put an addition on my house in 2012. And they came out and said I need to pay more taxes. So somebody saw an aerial photo there. Well, we do have drones now. Maybe that's what caught you there. Anyway, I'm sorry. No, you're fine. But, council, there's been a lot of discussion about whether the junk was out there, how far back it moved. But as you point out, the opposing council would have had to prove all of the elements of adverse possession. So is it true that even if the court had simply found that the possession was not of a nature, you know, that it was adverse in terms of they were allowing him to put this on here but he would move it away when they said something to him, wouldn't that be enough to defeat the claim? I would agree with that, Justice Alderwhite. I really would. And that's sort of what I've brought up. And I think it's important to note that the two predecessors in interest to these tile holders both passed away. They didn't provide any testimony in court. We don't know their intentions. We don't know what their agreements were or what their understandings between each other was. We are left with that question from the other witnesses that were gathered that day. And I did bring in and cited a case, and I know it's a 1941 Supreme Court case, Monroe v. Shrake, that talks about the presumption of permissive use of unoccupied or vacant ground. In that case, it was more of a prescription of easement, that the landowner wanted to restrict the use of a roadway that had been in existence for, I think, over 40 years. And they used it to haul timber back and forth at the time. Two other owners of that ground that was behind them that needed to use that road to get to their property was using it. And their contention was they gained that right by this adverse possession type of argument. And the court found that vacant and unoccupied land is presumed to be permissive. And that land at that point in time was farm ground that they were talking about. She had leased the farm ground out to the Shrakes, who was then asking to seek possession of that roadway or the right to use that roadway. And while that may not be controlling, I would use it as persuasive by the indication that if somebody is going to park a car or jump on my personal residence, I'm going to notice that. And I'm going to be upset about it. But if I'm farming this ground or doing it and I see the gradual extension of it, I may come and talk to him like the Tituses did, like the court found the Tituses did. Hey, you're extending, you're approaching on my ground, you need to move that back. Which the court found that it did. These were findings, in fact, made by the judge. And I would note that Terry Titus said this as well. He also made some mention about what this wash was. This wash, while the Tituses considered the wash, at least Justin Titus and I believe Terry Titus, they considered that whole 55 foot to wash. That was set there, it was never used to be farm ground. The northern farm, the farm to the north of them, would flood or when it would rain, it would wash rain across the roadway into the farm ground. So this area was used to prevent erosion of the topsoil. So Justin Titus, you can testify as to what he did to maintain that wash. He planted grass seed. He picked up the debris that was left from the junk that Mr. Jerry St. John would leave there. So he would upkeep that ground as well to try to prevent the erosion of his farm ground. To prevent that he would talk about chemicals in his farm that he was concerned about. All that was evidence that this wasn't an exclusive possession. It wasn't a continuous possession. It was, I don't even think it was a hostile to the law. I think it's permissive based upon the Monroe v. Schrader case. That he didn't prove any of his elements of adverse possession. Lastly, I've always been taught or always seen that the law has always tried to strive to come forth with equitable decisions between the dispute of two parties. That's what the goal, I believe, the law pertains to. And in this particular case, the defendant is asking the court and the judicial system to give him acreage for ground that is my client's. It's been in their generation for over 80 years. He just acquired it in 2016. And his claim is that I get that property because I and my predecessor of interest threw junk across it. We littered. We hurt the soil. We did these kind of things and I don't believe that's equitable. I don't believe that's what the law was meant to do. I don't think you can throw junk across a person's ground and then move it around and then say I now own it. These people worked and toiled on that farm. They don't use the wash as farming. They use it as a way to prevent erosion of the farm ground. So in the end, Judge Lewis came down with the ruling that, which I know that you've read, that defendant Cornwell has failed to meet his burden, prove establishing adverse possession. I find that the property of Mr. St. John was permissive and insufficient to support an adverse possession claim. The evidence fails to establish continuous possession of the property to a visible asset-obtainable boundary line. In addition, the possession was not hostile, adverse, exclusive, or under the claim of title inconsistent with that of a true owner. We would ask this court to uphold that ruling and affirm the decision of Judge Lewis. Thank you. Okay, thank you, counsel. Mr. Upenkamp, are you about all set? Yes. Okay. I'm going to try to cover this as fast as I can, the things that were addressed. With regard to the Monroe case, if that was the basis that Judge Lewis used to find that Mr. Cornwell, Mr. St. John's use of the property was permissive, it just doesn't apply to this type of case. Unoccupied or vacant ground, meaning if I put my junk and nobody's ever going to see it, okay, maybe that's the nature. They're farming this every year. It's not that they wouldn't see it. Neither was vacant or unoccupied. It was occupied by Mr. Cornwell and his predecessor, and it was occupied by the Titus' farming it. So that case would be totally inapplicable to the facts of this case. And if that's the ground that the trial court used to find that it was permissive, which I think it has to be, because there was no testimony whatsoever that says, yeah, I said he could put it there. All the testimony is every time we thought it went too far, we said something to him. We never let him put property there. Did St. John testify that St. John would move the junk back when challenged with an encroachment? The testimony was that Mr. St. John and Mr. Cornwell was there helping him move the stuff all the time. They were friends. Would move on the west side. Sometimes he would get out to the telephone pole. It would move back sometimes. The testimony as to back to the wash by Mr. Cornwell and Mr. Patrick, and sometimes Mr. Terry Titus, was all the way back to the wash, never moved. That property didn't move. Now, also, there was a reference counsel said that Justin Titus said, I considered the wash all 55 feet. Mr. Titus circled the wash more than once on those photographs. He didn't circle a giant 55-foot area. He circled the little triangular drainage area that everybody referred to as the wash during trial. So there was no testimony on the south side that St. John would move some of the junk back north when he was confronted that he was encroaching on somebody else's property. There was testimony by Mr. Justin Titus who said that. Again, that's the nature of manifest way. If the court accepted that testimony, that would be permissive use, would it not? It wouldn't be permissive use. It would simply be he didn't maintain. It wouldn't have been permissive use. It would have been the opposite of permissive, get off my property. But it would defeat Mr. Cornwell's claim because it would be, well, you moved your property, so you didn't have it up to this line the whole time. But it would not have been permissive. Just because if you say get your stuff off my property, it doesn't mean it was permissively on the property before that. Well, it would mean that you're acquiescing, that you agree you're trespassing, which means it was permissive. I think it's kind of a twist in the argument, but it seems like to me that would be a legitimate stance to take. He still had an understanding that I don't own the property, yet the property owner was giving him some leeway in terms of we'd say something every now and then, and then he would move it, and then we'd watch it creep back up, and then we'd say something. So it's kind of an inference of we've got this little understanding that you move it back when I tell you to. Your Honor, I think that would be true as to the 24 feet between the midway point to the telephone pole, and the court could find that. The argument wasn't out to the telephone pole where the property was sometimes. It was always halfway to the telephone pole all the time, and that's four out of five witnesses in all of the aerial photographs. As to the watch, the same is true. Three out of four, the argument would be, and all the aerial photographs show the property goes all the way to the watch all the time, never moves back. As briefly to address the question of equity, if Mr. Cornwell bought property and says, okay, this is my property because it's jump stacked out there, and I've been on this property from day one since Mr. St. John bought it in 1993. Equity says, I've always thought this is the property I've bought. I've always treated it. This is the property that I've bought, and this is, equity says, this is my property. This is what we all thought I had. Now, is there 24 feet that sometimes I push too far on? Okay, that's why we, that's why the argument is halfway to the telephone pole, not all the way to the telephone pole. With all of that, your honors, I would request that this court find that Judge Lewis's order was against the manifest way to the evidence of the first institution of the trial court. Thank you, counsel. The court will take a stand on the advisement. We recess until this afternoon.